THE STATE OF OHIO, APPELLEE, *v.* WOODS, APPELLANT.

(No. C-840837—Decided July 24, 1985.)

APPEAL: Court of Appeals for Hamilton County.

*Arthur M. Ney, Jr.,* prosecuting attorney, and *William E. Breyer,* for appellee.

*James N. Perry,* for appellant.

*Per Curiam.* Defendant, Thomas P. Woods, was found guilty in a bench trial of grand theft under the second count of the indictment, in which he was charged with obtaining $70,000 from Dorothy Berning by deception, in violation of R.C. 2913.02. He was also found guilty of the forgery and uttering of a $70,000 check payable to Dorothy Berning under the third and fourth counts, in violation of R.C. 2913.31. The subject matter of all three offenses involved the same sum of money. Defendant was acquitted of a separate charge of grand theft of $15,000 under the first count. He was sentenced to a definite term of one year on the theft conviction only.

On appeal, defendant presents five assignments of error: (1) the conviction was against the manifest weight of the evidence; (2) the court erroneously admitted in evidence certain parts of an expert's opinion about handwriting; (3) the court erroneously admitted a "loan agreement" into evidence; (4) the conviction was not supported by sufficient evidence under Crim. R. 29; and (5) the

court erroneously "tolerated" the prosecutor's closing argument that as an attorney, the defendant was subject to a "higher standard of care." We overrule all five assignments of error, noting that there is a dissent from our overruling of the first assignment of error (manifest weight of the evidence). We review the conflicts in the evidence in some detail in order to explain the conclusion reached by the majority about that assignment.

The focus of our review is on the relationship in February and March 1982 between defendant, an attorney then thirty-five years old, and Dorothy Berning, then seventy-six years old, who was his client and "friend." More particularly, we focus on what was the understanding between them, if any, about the disposition of the proceeds of a money market certificate of deposit in the amount of $70,000 issued by the Fifth Third Bank to Mrs. Berning. This certificate matured on March 4, 1982, and defendant handled its redemption by himself without Mrs. Berning's presence at the bank. He received a cashier's check for $70,000 payable to Mrs. Berning and wrote her name on the reverse side as an endorsement in blank, in a crude attempt to imitate her signature. The next day he deposited the endorsed check into his personal account at Gradison Cash Reserves, Inc. On March 26, 1982, he closed the purchase of a new residence (1421 Salem Woods Lane, Cincinnati) for $140,000, paying $84,229.15 by check and financing the balance by two mortgages. Defendant's check was covered by the withdrawal from his Gradison account of $86,000, a sum which may be said to have included the $70,000 redemption proceeds, another $15,000 from the earlier redemption (on February 25, 1982) of another Fifth Third certificate of deposit belonging to Mrs. Berning, and $1,000 of defendant's own savings. The foregoing facts are not disputed.

The conflict in the evidence centers on defendant's authority or right to make personal use of the $70,000 redemption proceeds. Defendant had no written authority whatsoever; he did not have a power of attorney, a letter, a note or a memorandum signed by Mrs. Berning, either authorizing this personal use or ratifying it. He testified that he sent her a handwritten message in a Hallmark "thank you" card, expressing appreciation for her generosity in making this money available as a loan, but he had no copy of that card. Mrs. Berning testified that she tore up and destroyed all cards, photographs, and "everything, at the time of this episode or whatever," not wanting to have any reminders of defendant. The only authority defendant had, if he had any at all, was oral. He and Mrs. Berning tell entirely different stories about their relationship and the $70,000 transaction. Mrs. Berning says he took it without authority. He says she offered to lend him the money so he could buy the house, without interest, with the understanding he would pay it back whenever she needed it.

Mrs. Berning testified that she did not give defendant permission to take the $70,000, to "cash" her check or to sign her name. She said, "It's all unbeknownst to me when it took place. It was the shock of my life, I had no idea." Defendant had been handling her financial affairs since her husband's death on February 1, 1981 (about one year and one month before the $70,000 transaction). Defendant had drawn Roger Berning's will (and hers) in 1976, and defendant not only made all of Mr. Berning's funeral and burial arrangements, but also managed all legal and financial affairs for Mrs. Berning. He consolidated funds from various financial institutions into a single account at a Fifth Third branch near her home, investing her funds principally in Fifth Third certificates of deposit, which totalled $187,000 in February 1982. She also had a small amount (unknown) in

stocks, as well as social security benefits. She stated she was very naive and he did not "give her any information whatever."

A week before the $70,000 transaction (that is, on February 25, 1982), another certificate of deposit had matured, this one in the amount of $15,000. Mrs. Berning endorsed in blank a Fifth Third cashier's check for $15,000, issued in redemption of that certificate of deposit, and defendant deposited this check in that same personal account of his at Gradison Cash Reserves, Inc. This transaction formed the basis of the theft charge in the first count of the indictment, but when Mrs. Berning was asked what was their mutual understanding about that money, she said, "It was merely an understanding that whatever it might be, it still remains, it's in his possession, it's still something that's indebted to me." (At the close of the state's case, the trial court granted defendant's motion to acquit him of the theft charged in the first count.)

Nine months later, in December 1982, Mrs. Berning asked both the defendant and the Fifth Third Bank to give her a list of her then outstanding certificates of deposit, and she cross-checked the lists against each other. They enumerated the same certificates. The bank's letter to Mrs. Berning also noted that both the $15,000 and the $70,000 certificates of deposit had been redeemed, and that cashier's checks had been issued for them.

On or about February 1, 1984, the Cincinnati Police Department was contacted, leading to defendant's arrest on February 3, 1984. Defendant's law partner testified that defendant, admitting that he took the money and used it for the purchase of his residence, said that his arrangement with Mrs. Berning was an "oral demand note."

Defendant's story is entirely different. He testified that a very close relationship developed between himself and Mrs. Berning in 1981 after Roger Berning's funeral. During the course of this relationship he supervised her financial affairs, ran errands for her (buying household items and her favorite sherry) and had long, friendly visits at her house. She had lost a husband; he had lost his father, a law partner (C. Robert Beirne) and his college roommate, all to cancer, and he had just been divorced from his first wife. In February 1982, he discussed with Mrs. Berning his intended purchase of a residence, remarking on the inflated prices at that time. She herself offered, he said, to let him use the proceeds of two certificates of deposit (totalling $85,000), coming due about that time, for the residential purchase. He felt he had her full authority to take the proceeds of both certificates of deposit; and, since she endorsed the $15,000 check herself, he felt he could endorse her name on the $70,000 check a week later. His tight, demanding schedule on March 4, 1982, and the need to wait for a shipment of sherry to come in before he could bring her some, allegedly prevented him from taking her to the bank to endorse the $70,000 check that day. She had named him sole beneficiary of her estate (in a will drafted by another lawyer, who was one of his partners or associates). She had insisted she did not need the yield from this money; and, on the day after the $70,000 transaction, when he brought the sherry to her, she said, "It gives me great pleasure to help you," and "You are the son I never had."

The case presents conflicting versions of the alleged offense, as is normal in criminal trials, and we do not find much in the record to corroborate either version. Mrs. Berning's version is supported by the fact defendant's loan application for his new residence makes no mention of the "loan" although it shows funds on deposit in Gradison Cash Reserves, Inc., in the amount of $89,000.

The defendant's version is supported by his claim that she did not demand repayment of the "loan" until February 2, 1984, and that he sent her an immediate payment of $500 (borrowed), and a later payment of $8,000 (from his Keogh plan); the entire balance of the $85,000 was paid on February 15, 1984. It will be remembered that the arrest took place on February 3, 1984.

The foregoing is sufficient to demonstrate our conclusion that the conviction was not against the manifest weight of the evidence. An appellate court may not substitute its judgment in factual matters for that of the trier of facts, whatever may be the reflections of a reviewing judge about how he might have decided the issues, and however tragic may be the destruction of a promising legal career.

It is the trier of facts who is best able to weigh the evidence and pass on the credibility of the witnesses. *State* v. *DeHass* (1967), 10 Ohio St. 2d 230 [39 O.O.2d 366], paragraph one of the syllabus. The discretionary power to reverse a judgment on the weight of the evidence and to grant a new trial should be exercised only in the exceptional case. *Tibbs* v. *Florida* (1982), 457 U.S. 31; *State* v. *Robinson* (1955), 162 Ohio St. 486 [55 O.O. 388]; *State* v. *Petro* (1947), 148 Ohio St. 473 [36 O.O. 152]. The first assignment of error is overruled.

The claim in the second assignment of error is that the handwriting expert's testimony against defendant should not have been admitted. The expert's opinion was that the endorsement on the $70,000 check was clearly not Mrs. Berning's, to a scientific certainty; however, his opinion about its being in defendant's handwriting was "probable," not definite. His testimony was admitted in evidence over defendant's objection. We held recently that a handwriting expert's opinion was admissible in evidence if it was based on a "strong

probability." *State* v. *Mullins* (Apr. 24, 1985), Hamilton App. No. C-840443, unreported. Assuming without deciding that an expert's opinion must be more than simply "probable" in order to satisfy the prosecution's burden of proof in a criminal case, we hold that defendant was not prejudiced, for two reasons: (1) he freely admitted in all his statements from his arrest through his trial that he signed Mrs. Berning's name to the $70,000 check; and (2) the evidence about the endorsement on that check has to do only with the charges of forgery and uttering, and not so much with the theft, and the only issues on appeal are those related to the conviction of theft.

The third assignment of error (that defendant's "loan application" for the residence should not have been admitted) is without merit, because his failure to disclose the Berning "loan" is relevant to the charge of theft by deception. It tends to make his intent to conceal and deceive more probable than it would have been without this exhibit. Evid. R. 401.

The fourth assignment asserts error in denying the motions for acquittal under Crim. R. 29, made at the close of the state's case and repeated at the close of all the evidence. It has no merit, because as is illustrated by our recital of the evidence before the trial court, there was substantial evidence from which the court as trier of the facts could reasonably conclude that all the elements of the offense had been proved beyond a reasonable doubt. *State* v. *Eley* (1978), 56 Ohio St. 2d 169 [10 O.O.3d 340], syllabus. We review the evidence, for this purpose, in the light most favorable to the prosecution. *Jackson* v. *Virginia* (1979), 443 U.S. 307, 319.

Defendant claims in the fifth assignment of error that the court "countenanced egregious error by tolerating the prosecutor's misconduct when the prosecutor argued for a 'higher standard of

care' because the accused is an attorney." Defendant contends that this part of the prosecutor's closing argument urged the court to convict defendant on proof less than that beyond a reasonable doubt. No objection was made to the prosecution's argument, however. Assuming it was excessive, the claimed error was waived, *State* v. *Williams* (1977), 51 Ohio St. 2d 112 [5 O.O.3d 98], death penalty vacated (1978), 438 U.S. 911, and it was not plain error. See *State* v. *Craft* (1977), 52 Ohio App. 2d 1 [6 O.O.3d 1].

Finding no error, we affirm.

KEEFE and KLUSMEIER, JJ., concur.

BLACK, J., dissenting. I concur in the overruling of the second, third, fourth, and fifth assignments of error, but I dissent from the overruling of the first assignment of error. I find merit in that assignment; I would reverse the defendant's conviction and remand this case for a new trial, which I assume would be on the charges of theft, forgery and uttering. Briefly, my reason is that the conviction of theft by deception was against the manifest weight of the evidence. After reviewing the entire record, weighing the evidence and all reasonable inferences therefrom, and considering the credibility of the two principal witnesses, I believe the trier of facts created a manifest miscarriage of justice in resolving the conflicts in the evidence in favor of the state. *Tibbs* v. *Florida* (1982), 457 U.S. 31. See *State* v. *Robinson* (1955), 162 Ohio St. 486 [55 O.O. 388]; *State* v. *Petro* (1947), 148 Ohio St. 473 [36 O.O. 152].

I recognize that the power of an appellate court to grant a new trial should be exercised only in the exceptional case, but I believe this is an exceptional case. It is our duty to determine whether the conviction is supported by the degree of proof required in criminal cases, *Cooper* v. *State* (1930), 121 Ohio St. 562, and I believe we must reverse a conviction when (as here) the evidence, in truth, weighs heavily against the conviction. I would grant Woods a new trial.

As I weigh the evidence, it fails to prove beyond a reasonable doubt the essential element of deception; it does not establish that Woods "obtain[ed] or exert[ed] control" over the $70,000 redemption proceeds "by deception," in violation of R.C. 2913.02(A)(3), as charged in the second count of the indictment.[1] Woods did not take those precautions that are customary (if not required) when an attorney administers or manages a client's financial affairs; he proceeded in a way that can only be termed inadvisable, to use the most

---

[1] "Deception" is defined in R.C. 2913.01(A):

" 'Deception' means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission which creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."

It will be noted that both forgery and uttering, under R.C. 2913.31, require proof of "purpose to defraud" or "knowing that he is facilitating a fraud," and that the definition of "defraud" in R.C. 2913.01(B) contains the element of "deception," as follows:

" 'Defraud' means to knowingly obtain, by *deception,* some benefit for oneself or another, or to knowingly cause, by *deception,* some detriment to another." (Emphasis added.)

In other words, all three offenses of which defendant was found guilty require proof of "deception" beyond a reasonable doubt, because if there were no deception by Woods, the crimes of theft, forgery and uttering were not committed.

charitable word. His conduct defies common sense, particularly in light of the fact he was borrowing money from a client. However, we are not now addressing a violation of the Code of Professional Responsibility; we are considering the question of guilt of a criminal charge of theft.

I have doubts that Woods acted with deception, and I believe these doubts to be reasonable. I do not believe he deceived Mrs. Berning by false representations, by withholding information, or by any other conduct perpetuating a false impression. He may have acted foolishly, but I do not believe the evidence establishes beyond a reasonable doubt that he acted deceptively. He left a well-marked trail a yard wide. He did not at any time deny he had signed his client's name to the redemption check and used the money to buy his new house, either to the police, to his law partner or to the court. The funds were not "laundered." They were traced with ease, because the transfer of $70,000 on March 4, 1982, from Mrs. Berning's control (ownership) to his control was plainly set forth on the records of the financial institutions involved. The transfer was never hidden from ordinary view. Mrs. Berning's bank statements disclosed that until March 1982 she received interest each month from the $70,000 certificate of deposit, ranging from $799 to $975. These credits to her account ceased on March 4, 1982. Nine months later when she asked defendant and the bank for an accounting of what she then held, both responded in writing, disclosing that the $70,000 was no longer in her account. The bank's letter specifically noted its redemption on March 4, 1982. The absence of interest on the $70,000 was also obvious to a bank employee who balanced Mrs. Berning's checkbook and to the professional who prepared her 1982 tax return. The alleged "victim" did not move against Mr. Woods until February 1984, two years after the transaction.

Woods' explanation of the relationship between himself and Mrs. Berning, and how he was caught in these suggestive circumstances, has the ring of truth. He helped an elderly person upon the death of her spouse, the most stressful moment of life, and developed a close relationship that had attractions and rewards for both of these lonely persons. It became a sort of mother-son relationship, she seeing him as the "son I never had," and he equating her "loan" as similar to a loan his own mother gave him. He was made the sole beneficiary of Mrs. Berning's will. When she said that she wanted him to have her $85,000 to buy his new house, he viewed it as a "friendly" loan, or an advancement on his inheritance.[2] He made two small payments ($250 and $200) in the first two months after receiving the

---

[2] Woods produced a handwritten note by Mrs. Berning enclosing the "automatic renewal notice" for the $70,000 certificate of deposit maturing March 4, 1982, in which she wrote:

"Thursday P.M.

"Dear Tom:

"As you can see I have taken upon myself to forward the enclosed not knowing if this is the proper procedure that I should follow. However I concluded that this would be one way of getting my message across rather than to contact you at your office.

"Hope that all is going well with you — shall be looking forward to some word from you and that you are making the progress that you are striving toward each and every day.

"Sincerely,
"/s/ Dottie"

We note that both February 25, 1982 and March 4, 1982 were Thursdays. Mrs. Berning's "message," however, is enigmatic, because she does not say in so many words what it is. A reasonable inference is that she meant to say, "Use these proceeds to help buy your new residence."

money, but she told him to desist. He did not think it necessary to do more than send her a handwritten "thank you," or to report this unsecured obligation on the loan application; he also failed to report the loan made by his own mother.

Woods consistently treated both the $15,000 transaction and the $70,000 transaction as two parts of a single loan. Mrs. Berning had no explanation for treating the $15,000 transaction as a loan and the other as a theft.

When Woods brought his intended second wife to the Berning residence in the summer of 1981 for a visit, Mrs. Berning reacted by calling him later, after he had returned to his own house, to say she preferred that he not bring a "third party" into her house. Mrs. Berning testified:

"He brought this lady friend all right.

"* * *

"I don't know what I said exactly, but I said, 'What are you trying to do, play both things in the middle?' I absolutely told him that distinctly."

On January 13, 1984, during Woods' visit to her residence, she began to express her concern about the impending third anniversary of her husband's death and, for the first time, she wondered aloud how her deceased husband would think of her conduct since his death. She was not living up to his expectations, and he would never have approved of her making an interest-free loan. On January 30, 1984, Woods offered to repay the loan, but she responded, "I don't know, I just don't know what to do." At her request, he obtained more sherry for her but refrained from contacting her on February 1,

1984. The next day, he found her depressed and emotional when he telephoned. She demanded repayment of her loan. He immediately sent her $500 by borrowing from a bank and set in motion the process to secure the remaining funds to pay the entire sum of $85,000. He was arrested the next day. The full sum was repaid.[3]

Mrs. Berning's version has certain inconsistencies. We have already noted her different treatment of the two redemptions. She said that when she endorsed the $15,000 redemption check on February 25, 1982 she expected it to be handled in the usual way, meaning reinvestment, but when she was questioned further, she conceded that she intended the money to be a loan to Woods; as noted by the majority, the charge that this money was stolen was dismissed. Mrs. Berning also said Woods kept her in the dark and did not inform her of what he was doing or not doing on her behalf. The evidence is to the contrary: it discloses that there was nothing hidden from her, and in particular, that transfer of the $70,000 was obvious for two years before she abruptly accused defendant of deceiving her. Finally, her testimony suggests she has a very selective memory because what she remembers from that period of three years during which the relationship was obviously rewarding to her are those incidents that are now damaging to defendant. She suffered a total reversal of her feelings about Woods.

I have grave doubts about the existence of deception in the $70,000 transaction. I cannot say the evidence was insufficient as a matter of law, using the test of *State* v. *Eley* (1978), 56

---

[3] The repayment of $85,000 to Mrs. Berning is not a determinative factor, because, as is true in every theft, the crime was completed when the accused obtained or exerted control over the money with the requisite mental state. The facts surrounding the repayment, however, may be factors to be considered in determining whether the accused obtained the money in the first instance by deception or with purpose to deprive the owner of it.

Ohio St. 2d 169 [10 O.O.3d 340], syllabus. I would not reverse and discharge, because that would require the total elimination of Mrs. Berning's testimony as a matter of law; her testimony is probative and entitled to some weight. I would give it very little weight under the circumstances revealed by the record. I would reverse the conviction and remand the case for a new trial.